**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **RABII BAGHDAD,** | : | |
| **Petitioner** | : | |
| | : | **No. 1:21-cv-293** |
| **v.** | : | |
| | : | **(Judge Rambo)** |
| **CLAIR DOLL,** | : | |
| **Respondent** | : | |

**<u>MEMORANDUM</u>**

On February 17, 20201, *pro se* Petitioner Rabii Baghdad ("Petitioner"), who is currently confined at the York County Prison in York, Pennsylvania ("YCP"), initiated the above-captioned action pursuant to 28 U.S.C. § 2241, challenging the constitutionality of his detention by the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"). (Doc. No. 1.) Petitioner asserts that he is entitled to relief because his detention has exceeded constitutional limits and because of the COVID-19 pandemic. (*Id.*) Following an Order to show cause (Doc. No. 7), Respondent filed a response, contending that Petitioner's detention is lawful (Doc. No. 10). Accordingly, Petitioner's § 2241 petition is ripe for disposition.

## I. BACKGROUND

### A. Facts Regarding Petitioner

Petitioner is a native and citizen of Morocco who was admitted to the United States at New York City as a lawful permanent resident on February 3, 2001. (Doc.

No. 10-1 at 3, 7.)  On August 21, 2019, he was convicted of retail theft in the Court of Common Pleas for Bucks County, Pennsylvania.  (*Id.* at 3.)  He was sentenced to twenty-three (23) months' imprisonment in the Bucks County Prison.  (*Id.* at 6.)

On August 18, 2020, the Bensalem Township Police Department arrested Petitioner on a bench warrant and a detainer was lodged with the Bucks County Prison.  (*Id.* at 8.)  That same day, ICE served Petitioner with a Notice to Appear, charging him with being removable, pursuant to section 237(a)(2)(A)(iii) of the Immigration and Nationality Act ("INA") based on his conviction of an aggravated felony "as defined in section 101(a)(43)(G) of the Act, a law relating to a theft offense (including receipt of stolen property) or burglary offense for which the term of imprisonment at least 1 year was imposed." (*Id.* at 3-4.)  Petitioner filed a motion to terminate proceedings, asserting that his conviction should not be classified as a aggravated felony.  (*Id.* at 11-14.)  On November 17, 2020, an immigration judge sustained the charge of removal and denied the motion to terminate.  (*Id.*)

On December 9, 2020, an immigration judge ordered Petitioner removed to Morocco.  (*Id.* at 15-21.)  On January 5, 2021, Petitioner appeared the removal order to the Board of Immigration Appeals ("BIA").  (*Id.* at 25-28.)  Petitioner requested an extension of time to submit his brief to the BIA.  (*Id.* at 30.)  Both parties' briefs were due on or before March 18, 2021.  (*Id.*)  Respondent represents that Petitioner's appeal is still pending before the BIA.  (*Id.*)

2

On February 4, 2021, DHS reviewed Petitioner's custody status pursuant to *Fraihat v. ICE*, --- F. Supp. 3d ---, 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020). (Doc. No. 10-1 at 33-35.)  DHS noted that Petitioner's hepatitis C placed him at heightened risk of contracting COVID-19, but decided that he should remain detained.  (*Id.* at 33.)  DHS stated that Petitioner's "medical conditions remain stable and are being properly treated and managed."  (*Id.* at 34.)  DHS noted further that YCP had implemented "extensive measure to adequately detect and prevent the spread of COVID-19 within the facility and to protect the health and safety of YCP detainees."  (*Id.*)  Finally, DHS noted that Plaintiff "present[ed] a potential threat to public safety and/or property" because of his convictions for retail theft as well as two prior convictions for driving under the influence.  (*Id.*)  Petitioner requested review of the custody determination by an immigration judge.  (*Id.* at 35.)

Petitioner is 44 years old and has been diagnosed with asthma, anxiety, depression, and hepatitis C.  (*Id.* at 37, 40, 44, 46.)  He tested positive for COVID-19 antibodies upon his intake at YCP on August 18, 2020.  (*Id.* at 36, 95.)  On January 9, 2021, because he had had close contact with another inmate with a confirmed positive test, Petitioner began daily COVID-19 screening for symptoms. (*Id.* at 47-94.)  These screenings continued until March 2, 2021, and he remained asymptomatic throughout.  (*Id.*)

**B.     Facts Regarding YCP's Response to COVID-19**

Since the onset of COVID-19, "ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees." (Resp. Ex. 11, Ritchey Decl. ¶ 8.)  YCP is following guidance set forth by the Centers for Disease Control ("CDC") "to safeguard those in its custody and care." (*Id.* ¶ 9.)  Moreover, on April 10, 2020, "ICE ERO released its *COVID-19 Pandemic Response Requirements* (PRR), a guidance document that builds upon previously issued guidance and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees." (*Id.* ¶ 10.)  The PRR also sets forth "best practices for such facilities." (*Id.*)

ICE has reviewed its detained population of at risk inmates to "determine if detention remains appropriate, considering the detainee's health, public safety, and mandatory detention requirements, and adjusted custody conditions, when appropriate, to protect the health, safety, and well-being of its detainees." (*Id.* ¶ 27.)  YCP "has the capacity to house 2,245 inmates and has historically often operated near capacity." (*Id.* ¶ 7.)  As of March 11, 2021, however, "there [were] only 1,2020 combined male and female inmates and detainees housed at the facility." (*Id.*)

YCP screens all detainees for COVID-19.  (*Id.* ¶¶ 11-12.)  During intake medical screenings, detainees are assessed for fever and symptoms of respiratory

illness and asked to confirm whether they have had close contact with a person with a confirmed COVID-19 infection or "traveled from or through area(s) with sustained community transmission in the past two weeks." (*Id.* ¶ 13.) "The detainee's responses and the results of these assessments will dictate whether to monitor or isolate the detainee." (*Id.* ¶ 14.) All intakes are screened with temperature checks, a questionnaire, and antibody testing, with or without a nasal swab. (*Id.* ¶¶ 12-13.) All staff and vendors are also screened when they enter the facility. (*Id.* ¶ 20.) Automatic electronic temperature screening devices have been installed at employee entrances. (*Id.*) Moreover, YCP has limited professional visits to non-contact visits and has suspended in-person social visitation and facility tours. (*Id.* ¶ 21.) Detainees may meet with their attorneys via video or telephone. (*Id.* ¶ 21.)

Detainees have daily access to sick call and 24/7 access to the onsite medical staff. (*Id.* ¶ 18.) "After hours, there is always a provider on call to answer questions and manage medical issues." (*Id.*) Per ICE policy, YCP has designated units to be used for routine quarantining of asymptomatic intakes and transfers. (*Id.* ¶ 15.) These units accept detainees until they are at 50% capacity and then they are closed, and the 14-day quarantine clock starts when the last detainee is admitted. (*Id.* ¶ 15.) If a detainee in a unit develops symptoms during quarantine, that detainee is moved to isolation and the 14-day period starts anew. (*Id.*) Symptom and temperature checks are performed daily, and a random unit within YCP is chosen for COVID-19

screening every day.  (*Id.*)  Before a unit is opened to the general population, everyone is screened with symptom and temperature checks.  (*Id.*)  Medical staff also conduct roving temperature checks throughout the facility.  (*Id.* ¶ 25.)

Detainees who test positive are isolated and treated and transported to the hospital if their condition deteriorates.  (*Id.* ¶¶ 14, 23.)  YCP has negative pressure single isolation rooms, as well as an old gyn and work release center, that can be used for isolation housing.  (*Id.* ¶ 23.)  Isolated detainees are assessed twice daily. (*Id.*)

Asymptomatic detainees who have been exposed to someone with COVID-19 are placed in quarantine with restricted movement for a minimum of 14 days, but in most cases 21 days.  (*Id.* ¶ 16.)  They are monitored daily for fever and respiratory illness.  (*Id.*)  Those that show fever or respiratory illness are referred to a medical provider for evaluation.  (*Id.*)  Quarantining is discontinued when the minimum 14-day period is complete with no new cases.  (*Id.*)  Although cells and units for administrative or disciplinary segregation may be used for quarantine and isolation, detainees are still provided access to TV, reading materials, recreation, and telephones to the fullest extent possible.  (*Id.* ¶ 17.)

YCP has increased the frequency of sanitation protocols, the availability of sanitation supplies in the housing units, and repeatedly cleans high-traffic areas throughout the day.  (*Id.* ¶ 19.)  Soap, water, and hard surface disinfectant are

available in all housing units. (*Id.*) Each detainee receives a bar of soap and immediately receives a replacement once it is gone. (*Id.*) Detainees have access to 670 bathroom sinks and areas for handwashing and hygiene. (*Id.*) There are forty-seven (47) hand sanitizer stations present throughout YCP for staff to use. (*Id.*) Alcohol-based hand sanitizer is also available for staff to use. (*Id.*) Hand sanitizer is not provided to detainees for security reasons, but they do receive a travel-sized packet of hand sanitizer to take with them upon release. (*Id.*) Telephones in all common areas are cleaned after each use. (*Id.*) Detainees may ask for cleaning supplies at any time. (*Id.*)

All staff or personnel entering YCP must wear a surgical-style mask; they are required to wear N-95 masks if they are dealing with symptomatic detainees or those who have tested positive for COVID and if they are conducting outside transports. (*Id.* ¶ 25.) As of September 2, 2020, all staff and personnel entering YCP must wear N-95 masks as well as safety glasses. (*Id.*) Employees have also been provided face shields as alternatives to safety glasses. (*Id.*) On April 7-8, 2020, YCP distributed surgical masks to all detainees and inmates, along with directions for proper use. (*Id.*) YCP has also arranged to launder masks and provide a second mask to each person in custody. (*Id.*) Detainees may remove their masks to eat, drink, and shower. (*Id.*) Those confined to cells must wear the masks anytime they are out of the cell. (*Id.*) Detainees in dormitory settings must wear their masks when not

sleeping, but mask-wearing while sleeping is encouraged. (*Id.*) Isolated detainees must wear N-95 masks when they leave their unit. (*Id.*) Detainees are encouraged to war their masks at all times and can receive disciplinary reports if they are consistently non-compliant. (*Id.*)

YCP has test kits available, and all new intakes are tested for COVID-19 antibodies. (*Id.* ¶ 12.) If they test negative for COVID-19 antibodies they are given nasal swab tests. (*Id.*) YCP also routinely performs COVID-19 tests in the absence of clinical suspicion. (*Id.*) YCP offers voluntary nasal swab testing to staff members. (*Id.* ¶ 20.) Staff members also have access to a commercial lab center open to the public. (*Id.*) YCP has administered approximately 7,095 nasal swab tests and 3,237 antibody tests from March 2020 until the morning of March 19, 2021. (Resp. Exs. 12, 13.) 1,846 rapid tests have been performed. (Resp. Ex. 14.)

As of March 11, 2021, there have been 269 confirmed cases of COVID-19 among ICE detainees since March of 2020. (Ritchey Decl. ¶ 24.) Six (6) of those tested positive prior to entering ICE custody at YCP. (*Id.*) As of the morning of March 11, 2021, there were five (5) ICE detainees who had tested positive and were housed in isolation under medical observation. (*Id.*) There have been 691 confirmed cases among county inmates; 687 of those have been cleared and are no longer subject to isolation or quarantine. (*Id.*) There have been no deaths at YCP. (*Id.*)

### C.    Petitioner's § 2241 Petition

Petitioner filed the instant § 2241 petition on February 17, 2021.  (Doc. No. 1.)  He seeks immediate release, arguing that he has been subjected to prolonged mandatory detention and that he suffers from high blood pressure, depression, anxiety, and "mental liver Hep-C." (*Id.* at 3, 5-6.)  He maintains that he is "especially vulnerable to serious illness" and that it is "unconstitutional to detain immigrants . . . during a pandemic." (*Id.* at 5.)  Petitioner asserts that his detention violates substantive and procedural due process.  (*Id.* at 10-11.)

## II.    LEGAL STANDARD

Under 28 U.S.C. § 2241(c), a prisoner or detainee may receive habeas relief only if he "is in custody in violation of the Constitution or laws or treaties of the United States."  *See* 28 U.S.C. § 2241(c)(3); *see also Maleng v. Cook*, 490 U.S. 488, 490 (1989).  Because Petitioner is currently detained within the jurisdiction of this Court and asserts that his continued detention violates due process, this Court has jurisdiction over his § 2241 petition.  *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001); *Spencer v. Kemna*, 523 U.S. 1, 7 (1998).

## III.    DISCUSSION

Respondent asserts that Petitioner's § 2241 petition should be denied because: (1) he is lawfully detained under 8 U.S.C. § 1226(c) and (2) his conditions of

confinement do not violate the Constitution.   (Doc. No. 10 at 34.)   The Court considers these arguments in turn below.

### A.   Petitioner's Custody Pursuant to 8 U.S.C. § 1226(c)

In the instant case, the parties do not dispute that Petitioner is currently detained pursuant to 8 U.S.C. § 1226(c), which provides for pre-removal mandatory detention of individuals previously convicted of certain criminal offenses.  *See* 8 U.S.C. § 1226(c).  An individual detained under § 1226(c) may be released only if the Attorney General decides that release is necessary to protect a witness and that the individual is not a flight risk and does not pose a danger to society.  *See id.* § 1226(c)(2).  Thus, "section 1226(c) does not give the Attorney General any authority to release these [individuals] on bond."  *See Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 473 (3d Cir. 2015) (citing *Demore v. Kim*, 538 U.S. 510, 521 (2003)), *abrogated in part on other grounds by Jennings v. Rodriguez*, 138 S. Ct. 830 (2018).

Previously, the Third Circuit "read *Demore* as also recognizing that there are limits to" the Government's authority to detain individuals under § 1226(c) without an opportunity to be considered for bond.  *See Chavez-Alvarez*, 783 F.3d at 473 (citing *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 233 (3d Cir. 2011); *Leslie*, 678 F.3d 265).  Specifically, the Third Circuit recognized that the *Demore* Court based its ruling upon the short, fixed, and finite term of pre-removal detention.  *See id.* at

474.  Thus, in *Chavez-Alvarez*, the Third Circuit "read a reasonable time limit into the statute, relying on the Court's earlier decision in *Diop*, which employed the doctrine of constitutional avoidance to come to this conclusion."  *See Coello-Udiel v. Doll*, No. 3:17-CV-1414, 2018 WL 2198720, at *3 (M.D. Pa. May 14, 2018) (citing *Chavez-Alvarez*, 783 F.3d at 475; *Diop*, 656 F.3d at 231).  The court noted that the point at which a detained individual's liberties outweigh the interests advanced by detention pursuant under § 1226(c) occurs after the six-month time frame considered in *Demore* and before the individual has been detained for one year.  *See Chavez-Alvarez*, 783 F.3d at 478.

The Supreme Court, however, has explicitly rejected the practice of reading an implicit time limit into § 1226(c).  *See Jennings*, 138 S. Ct. at 846-47.  In *Jennings*, the Supreme Court overruled the Ninth Circuit's conclusion that "§ 1226(c)'s mandatory [detention] language must be construed to contain an implicit reasonable time limitation."  *See Rodriguez v. Robbins*, 804 F.3d 1060, 1079 (9th Cir. 2015) (internal quotations omitted).  In its opinion, the *Jennings* Court noted:

> [Section] 1226(c) does not on its face limit the length of the detention it authorizes.  In fact, by allowing aliens to be released "only if" the Attorney General decides that certain conditions are met, § 1226(c) reinforces the conclusion that [individuals] detained under its authority are not entitled to be released under any circumstances other than those expressly recognized by the statute.  And together with § 1226(a), § 1226(c) makes clear that detention of aliens within its scope <u>must</u>

continue "pending a decision on whether the alien is to be removed from the United States." § 1226(a).

In a reprise of their interpretation of § 1225(b), respondents argue, and the [Ninth Circuit] held, that § 1226(c) should be interpreted to include an implicit 6-month time limit on the length of mandatory detention. Once again, that interpretation falls far short of a "plausible statutory construction."

In defense of their statutory reading, respondents first argue that § 1226(c)'s "silence" as to the length of detention "cannot be construed to authorize prolonged mandatory detention, because Congress must use 'clearer terms' to authorize 'long-term detention.'"  . . . .   But § 1226(c) is <u>not</u> "silent" as to the length of detention.  It mandates detention "pending a decision on whether the alien is to be removed from the United States," § 1226(a), and it expressly prohibits release from that detention except for narrow, witness-protection purposes. Even if courts were permitted to fashion 6-month time limits out of statutory silence, they certainly may not transmute existing statutory language into its polar opposite.  The constitutional-avoidance canon does not countenance such textual alchemy.
. . .
Respondents next contend that § 1226(c)'s limited authorization for witness-protection purposes does not imply that other forms of release are forbidden, but this argument defies the statutory text.  By expressly stating that the covered aliens may be released "only if" certain conditions are met, 8 U.S.C. § 1226(c)(2), the statute expressly and unequivocally imposes an affirmative <u>prohibition</u> on releasing detained aliens under any other conditions.
. . .
We hold that § 1226(c) mandates detention of any alien falling within its scope and that detention may end prior to the conclusion of removal proceedings "only if" the [individual] is released for witness protection purposes.

*Jennings*, 138 S. Ct. at 846-47.  Thus, to the extent that the Third Circuit's holdings in *Diop* and *Chavez-Alvarez* were grounded in the canon of constitutional avoidance, those holdings do not survive the Supreme Court's decision in *Jennings*.  *See*

*Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d 208, 222 & n.11 (3d Cir. 2018).

*Jennings*, however, "did not call into question [the] constitutional holding in *Diop* that detention under § 1226(c) may violate due process if unreasonably long." *See Borbot v. Warden Hudson Cty. Corr. Facility*, 906 F.3d 274, 278 (3d Cir. 2018). Thus, "even after *Jennings*, an alien lawfully present but detained under § 1226(c) can still challenge his detention under the Due Process Clause." *See German Santos v. Warden Pike Cty. Corr. Facility*, 965 F.3d 203, 210 (3d Cir. 2020). When considering whether a petitioner's detention has become unconstitutional, "[t]he most important factor is the duration of detention." *See id.* at 211. Moreover, the Court must also consider "all the other circumstances" of detention, including: (1) "whether the detention is likely to continue"; (2) "the reasons for the delay, such as a detainee's request for continuances"; and (3) "whether the alien's conditions of confinement are 'meaningfully different' from criminal punishment." *See id.* (quoting *Chavez-Alvarez*, 783 F.3d at 478).

At the outset, the Court cannot afford Petitioner the requested relief of release from custody. The Court will, however, consider the *German Santos* factors to determine whether he is entitled to a bond hearing. With respect to the first factor, the duration of detention, Petitioner has been detained since August 18, 2020, approximately eight (8) months. District courts within the Third Circuit have

"largely found that detention for just over a year pursuant to § 1226(c) is insufficient to amount to an arbitrary deprivation of liberty and will thus not suffice to prove that the statute has been unconstitutionally applied." *Gabriel v. Barr*, No. 1:20-cv-1054, 2021 WL 268996, at *3 (M.D. Pa. Jan. 27, 2021); *see also Moises Acevedo v. Decker*, No. 1:20-cv-1679, 2020 WL 8120875, at *7 (M.D. Pa. Nov. 17, 2020) (concluding that 7 ½ months of detention was insufficient for the first factor to weigh in the petitioner's favor), *report and recommendation adopted*, 2021 WL 120473 (M.D. Pa. Jan. 13, 2021). Thus, this factor, which the *German Santos* court considered to be "the most important," does not trigger heightened scrutiny and weighs against relief at this time. *German Santos*, 965 F.3d at 211.

The Court must next consider whether Petitioner's detention is likely to continue. As noted *supra*, the parties' briefs for Petitioner's appeal of the removal order were due on or before March 18, 2021, and his appeal is currently pending before the BIA. Thus, while there may be additional proceedings because Petitioner would be able to petition for review by the Third Circuit of an adverse BIA ruling, "this carries little weight as, to date, all proceedings have proceeded in a timely manner without any significant delay attributable to either side." *Gabriel*, 2021 WL 268996, at *4.

Third, the Court must consider the reasons for the delay in Petitioner's removal proceedings. The Court will not hold Petitioner's "good-faith challenge to

his removal against him, even if his appeals or applications for relief have drawn out the proceedings." *See German Santos*, 965 F.3d at 211 (citing *Chavez-Alvarez*, 783 F.3d at 476-77). "Doing so, and counting this extra time as reasonable, would 'effectively punish [him] for pursuing applicable legal remedies.'" *See id.* (quoting *Chavez-Alvarez*, 783 F.3d at 475). Here, while Petitioner requested one extension to file his brief with the BIA, there is no indication that he has engaged in bad faith or caused significant delay. Rather, he has vigorously and timely challenged his removal.

Respondent maintains that this factor weights in his favor. (Doc. No. 8 at 20.) The Court disagrees and instead concludes that this factor does not favor either party. Nothing in the record before the Court suggests that the Government has intentionally delayed or unreasonably prolonged Petitioner's removal proceedings. Respondent asserts that "some portion of the length of Petitioner's detention is attributable to his own delay as he has sought continuances and extensions at the administrative level, and filed countless motions, petitions, and briefs." (Doc. No. 8 at 20.) While this is so, Petitioner has not sought any substantial continuances. Moreover,

Finally, the Court must consider whether Petitioner's "conditions of confinement are 'meaningfully different' from criminal punishment." *German Santos*, 965 F.3d at 211 (quoting *Chavez-Alvarez*, 783 F.3d at 478). "[I]f an alien's

civil detention under § 1226(c) looks penal, that tilts the scales toward finding the detention unreasonable. And as the length of detention grows, so does the weight that [the Court] give[s] this factor." *See id.* (citing *Chavez-Alvarez*, 783 F.3d at 478). The Court recognizes that the "Third Circuit has already said that the conditions of confinement for immigration detainees at York County Prison look penal." *Clark v. Doll*, 481 F. Supp. 3d 394, 398 (M.D. Pa. 2020) (citing *Chavez-Alvarez*, 783 F.3d at 478). However, Petitioner is not confined to his cell for 23 hours a day, unless he is in medical isolation. (Ritchey Decl. ¶ 17.) Moreover, detainees are provided access to TV, reading materials, recreation, and telephones to the fullest extent possible. (*Id.*) The Court is also cognizant of the fact that DHS recently reviewed Petitioner's custody status on February 4, 2021. (Doc. No. 10-1 at 33-35.) The Court, therefore, cannot say that Petitioner's present detention, which was reviewed within the last two (2) months, and is authorized by statute, is unconstitutionally punitive.

In sum, the Court cannot conclude that § 1226(c), as applied to Petitioner, violates his due process rights. The Court, therefore, will deny his § 2241 petition to the extent he seeks a bond hearing regarding his detention status.

## B. Petitioner's Request for Release Based Upon COVID-19

A civil immigration detainee is entitled to the same due process protections as a pretrial detainee under the Fifth Amendment. *See Hope v. Warden York Cty. Prison*, 972 F.3d 310, 325 (3d Cir. 2020) (citing *E.D. v. Sharkey*, 928 F.3d 299, 306-

07 (3d Cir. 2019)).  Habeas corpus cases in which an immigration detainee alleges a violation of his Fifth Amendment rights arising from COVID-19 "are generally based on two 'separate but related theories': first, that the petitioner's risk of exposure to COVID-19 amounts to punishment, and second, that the detention facility's COVID-19 policies amount to deliberate indifference to a serous medical need." *Dannu v. ICE*, No. 1:20-cv-1491, 2021 WL 916191, at *2 (M.D. Pa. Mar. 10, 2021).  Under either theory, a court should consider:

> (1) whether the petitioner has been diagnosed with COVID-19 or is experiencing symptoms consistent with the disease; (2) whether the petitioner is among the group of individuals that is at higher risk of contracting COVID-19; (3) whether the petitioner has been directly exposed to COVID-19; (4) the physical space in which the petitioner is detained, and how that physical space affects his risk of contracting COVID-19; (5) the efforts that the prison has made to prevent or mitigate the harm cased by COVID-19; and (6) any other relevant factors.

*Saillant v. Hoover*, 454 F. Supp. 3d 465, 471 (M.D. Pa. 2020).  "It is not enough for a petitioner to allege that he is detained and presented with a risk of contracting COVID-19 that is common to all prisoners.  Rather, the petitioner must make an individualized showing that he is entitled to habeas corpus relief when considering the above factors." *Id.* (citing *Verma v. Doll*, No. 4:20-cv-14, 2020 WL 1814149, at *5-7 (M.D. Pa. Apr. 9, 2020)).

### 1.   Conditions of Confinement

With respect to Petitioner's claim that conditions at YCP violate the Constitution, he must demonstrate that his conditions of confinement "amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). "To determine whether challenged conditions of confinement amount to punishment, [a court must] determine[] whether a condition of confinement is reasonably related to a legitimate governmental objective." *Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)). If it is not, the Court "may infer that the purpose of the governmental action is [unconstitutional] punishment." *Id.* The Third Circuit "further instructs that [courts must] consider the totality of the circumstances of confinement, including any genuine privations or hardship over an extended period of time, and whether conditions are (1) rationally related to their legitimate purpose or (2) excessive in relation to that purpose." *Hope*, 972 F.3d at 326.

When assessing whether a governmental interest is legitimate, the Supreme Court has not "detail[ed] the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention." *Bell*, 441 U.S. at 540. However, the Supreme Court has recognized that ensuring detainees' presence at hearings, along with "the effective management of the detention facility once the individual is confined," constitute legitimate governmental interests. *Id.* Moreover, the Government has a legitimate interest in "protecting the public from harm," *Hope*,

972 F.3d at 326, and "in reducing the flight risk posed by prisoners facing removal." *Builes v. Warden Moshannon Valley Corr. Ctr.*, 712 F. App'x 132, 134 (3d Cir. 2017).

Upon review of the record, the Court concludes that the current conditions at YCP do not amount to unconstitutional punishment.  The Court recognizes that "[p]risons present unique concerns regarding the spread of this virus; by their very nature, prisons are confined spaces unsuited for 'social distancing.'"  *Verma*, 2020 WL 1814149, at *4.  However, "CDC guidelines specifically contemplate that individuals will be confined within prisons during the duration of this pandemic." *Evdokimow v. Doll*, No. 4:21-cv-261, 2021 WL 767554, at *6 (M.D. Pa. Feb. 26, 2021).  Conditions at YCP no longer resemble the "unsanitary, tightly-packed environments" that led a different Judge in this district to order the release of ICE detainees last year.  *See Thakker v. Doll*, 451 F. Supp. 3d 358, 370 (M.D. Pa. 2020).

First, YCP has removed many detainees and, as of March 11, 2021, was operating 48% under capacity.  (Doc. No. 10 at 23.)  Moreover, YCP has taken significant measures to sanitize the environment, as well as prevent the introduction or spread of COVID-19.  As noted *supra*, all new intakes are tested for COVID-19 antibodies, and any who do not test positive for such antibodies are provided a swab test.  Moreover, medical intake screenings assess detainees for fever and respiratory illness and whether they have had close contact with infected individuals.  If a

detainee tests positive, he or she is placed in isolation.  If a detainee is exposed to a person who has COVID-19, asymptomatic detainees are placed in quarantine and are monitored daily for symptoms.  Medical staff also conduct roving temperature checks throughout the facility.

YCP provides soap, water, and disinfectant to inmates.  Hand sanitizer is available to staff, and high-traffic areas are cleaned and disinfected repeatedly throughout the day.  Telephones are cleaned after each use.  All inmates have been provided with surgical masks, and all staff members must wear an N95 mask.  YCP has also limited professional visits to non-contact visits and has suspended in-person visitation and facility tours.  Detainees may still meet with their attorneys via telephone or video non-contact visits.

These measures indicate that Petitioner's conditions of confinement are not unconstitutionally overcrowded or unsanitary.  Instead, they have been effective at curbing the introduction or spread of COVID-19 at YCP.  Since March 2020, there have been 269 cases of COVID-19 among ICE detainees; however, as of March 11, 2021, there were five (5) detainees who were positive for COVID-19 and housed in isolation.  Another Judge of this district has emphasized the "drastic changes put into effect at [YCP]," concluding that the improved conditions there did "not negate the Government's legitimate interest in detention."  *Thakker*, 456 F. Supp. 3d at 657. Likewise, in *Hope*, the Third Circuit analyzed conditions that, "at the time, were

similar to the conditions as they exist today, although arguably less safe because the facility did not have the ability to test all new incoming detainees." *Evdokimow*, 2021 WL 767554, at *8 (citing *Hope*, 972 F.3d at 327-28).  Nevertheless, the Third Circuit concluded that the petitioners had not demonstrated likelihood of success on their claim that the conditions of confinement amounted to unconstitutional punishment.  *Hope*, 972 F.3d at 329.

In sum, the Court concludes that the record reflects that detainees at YCP receive adequate protection from COVID-19.  Petitioner's detention is reasonably related to several legitimate governmental interests, and his conditions of confinement do not amount to punishment that violates the Constitution.  Accordingly, Petitioner's claim regarding his conditions of confinement will be denied.

### 2.   Deliberate Indifference

Petitioner also appears to be asserting a claim that YCP has demonstrated deliberate indifference to his medical needs.  With respect to allegations of inadequate medical care, prison officials violate the Fifth Amendment "when they exhibit deliberate indifference to serious medical needs of prisoners."  *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005).  "The detainee's condition must be such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death."  *Id.*  However, "there can be no reckless or deliberate

indifference to that risk unless there is something more culpable on the part of the officials than a negligence failure to recognize [such] high risk." *Id.* "[T]he risk of . . . injury must not only be great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidence an absence of any concern for the welfare of his or her charges." *Id.*

Petitioner suggests that the only way to protect vulnerable individuals, such as himself, from serious health outcomes is to "prevent them from being infected with" COVID-19." (Doc. No. 1 at 4.)  However, "a failure to eliminate all risk [does not] establish that the Government was deliberate indifferent" to his serious medical needs.  *Hope*, 972 F.3d at 330.  While COVID-19 certainly presents a serious medical issue, as noted *supra*, YCP "has taken significant steps to curb the introduction or spread of COVID-19 and to contain and treat those who may become infected with the virus." *Evdokimow*, 2021 WL 767554, at *8.  Again, as of March 11, 2021, only five (5) ICE detainees were infected with COVID-19.  The Court cannot conclude from the record before it that YCP has been deliberately indifferent to Petitioner's medical needs.  On the contrary, YCP has "quickly and effectively implemented the guidelines published by the CDC such that [it has] stymied any potential outbreak within [its] walls . . . and [any COVID-19 outbreak at YCP] appears to have been effectively contained." *Thakkker*, 456 F. Supp. 3d at 660. "There is perfect solution to preventing the spread of COVID-19 in detention

facilities, but [YCP] officials have taken reasonable steps to limit the spread throughout its facility." *Verma*, 2020 WL 1814149, at *6. Petitioner, therefore, cannot establish "a conscious disregard for the risk posed by COVID-19." *Id.*

Moreover, there is no evidence that Petitioner's medical condition is such "that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." *Woloszyn*, 396 F.3d at 320. Petitioner is 44 years old and has been diagnosed with asthma, anxiety, depression, and hepatitis C. As noted *supra*, when conducting Petitioner's custody review, ICE noted that his hepatitis C increased his risk should he contract COVID-19. However, the record reflects that Petitioner tested positive for COVID-19 antibodies upon intake at YCP on August 18, 2020. Moreover, after Petitioner had close contact with another individual who tested positive for COVID-19, medical staff at YCP began daily symptom screenings on January 9, 2021. These screenings continued until March 2, 2021, and Petitioner remained asymptomatic throughout. Given this record, the Court cannot conclude that YCP has been deliberately indifferent to any risk to Petitioner's medical needs. Accordingly, his claim for deliberate indifference will also be denied.

## IV.   CONCLUSION

For the foregoing reasons, the Court will deny Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241.  (Doc. No. 1.)  An appropriate Order follows.

s/ Sylvia H. Rambo
United States District Judge

Date: April 13, 2021